**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA TROJAN PARTNERSHIP,
           *Plaintiff-Appellant,*

v.

CARLOS M. GUTIERREZ;* UNITED
STATES DEPARTMENT OF COMMERCE;
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION;
NATIONAL FISHERIES SERVICE,
           *Defendants-Appellees.*

No. 04-35753

D.C. No.
CV-04-00003-
J-RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
July 14, 2005—Anchorage, Alaska

Filed September 22, 2005

Before: Alfred T. Goodwin, Melvin Brunetti, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Brunetti

---

*Carlos M. Gutierrez is substituted for his predecessor, Donald L. Evans, as Secretary of Commerce of the United States, pursuant to Fed. R. App. P. 43(c)(2).

13591

**COUNSEL**

Michael A. D. Stanley, Juneau, Alaska, for the appellant.

James C. Kilbourne, Department of Justice, Washington, D.C., for the appellees.

**OPINION**

BRUNETTI, Circuit Judge:

Alaska Trojan Partnership ("Alaska Trojan") challenges the decision of Carlos M. Gutierrez, in his official capacity as Secretary of Commerce ("the Secretary"), the United States Department of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service ("NMFS")[1] (collectively "defendants") denying

---

[1]National Marine Fisheries Service is now known as NOAA Fisheries.

Alaska Trojan's application for an Aleutian Islands brown king crab endorsement under the license limitation program ("LLP") for the Bering Sea and Aleutian Islands groundfish and crab fisheries. Defendants determined that Alaska Trojan made only two "documented harvests" of brown king crab in the Aleutian Islands brown king crab endorsement area during the endorsement qualification period, January 1, 1992, through December 31, 1994, and therefore denied Alaska Trojan an Aleutian Islands brown king crab endorsement. Alaska Trojan argues that it made three "documented harvests" and therefore is entitled to receive an Aleutian Islands brown king crab endorsement. Alaska Trojan argues that defendants' interpretation of the term "documented harvest" is inconsistent with the plain meaning of that term as defined in the regulations implementing the LLP, and that defendants' interpretation of "documented harvest" is inconsistent with the intent of the LLP. We agree with Alaska Trojan on both issues and reverse the judgment of the district court granting summary judgment for defendants. We further hold that Alaska Trojan is entitled to summary judgment.

## FACTS AND PROCEEDINGS BELOW

### License Limitation Program

Pursuant to the Magnuson-Stevens Fisheries Conservation Act, 16 U.S.C. §§ 1801, *et seq.* ("Magnuson Act"), Congress delegated authority to the Secretary to manage and conserve coastal fisheries. The Magnuson Act created independent fishery councils to assist the Secretary in carrying out these management and conservation duties. *See id.* § 1852. The primary duty of these councils is to prepare fishery management plans and amendments to those plans, which the Secretary reviews and, when appropriate, promulgates regulations to implement. *See id.* §§ 1852(h), 1854(a)-(b). Pursuant to the Magnuson Act, the North Pacific Fishery Management Council ("the Council") recommends fishery management plans for fisheries in the Arctic Ocean, the Bering Sea, and the Pacific

Ocean seaward of Alaska. *See id.* § 1852(a)(1)(G). This court has recently provided substantial background concerning the Magnuson Act and the Council. *See Yakutat, Inc. v. Gutierrez,* 407 F.3d 1054, 1057-62 (9th Cir. 2005).

After reviewing several fishery management plans, at its June 1995 meeting the Council ultimately adopted and submitted to NMFS an LLP to regulate crab harvesting as Amendment 5 to the Fishery Management Plan for the Commercial King and Tanner Crab Fisheries. Based on the Council's recommendation, NMFS published proposed LLP regulations for notice and comment. 62 Fed. Reg. 43,866 (proposed Aug. 15, 1997) (hereinafter "Proposed Rule"). NMFS prepared final regulations and forwarded them to the Secretary for review. After the Secretary approved the LLP regulations, NMFS published the final regulations to implement the LLP on October 1, 1998. Fisheries of the Exclusive Economic Zone Off Alaska, 63 Fed. Reg. 52,642 (Oct. 1, 1998) (codified at 50 C.F.R. pt. 679) (hereinafter "Final Rule"). Regulations establishing an application process and transfer process for LLP licenses were promulgated on August 6, 1999. 64 Fed. Reg. 42,826 (Aug. 6, 1999) (codified at 15 C.F.R. pt. 902; 50 C.F.R. pt. 679). Anyone who wanted an Aleutian Islands brown king crab endorsement was required to file an application by December 17, 1999. *See* 50 C.F.R. § 679.4(k)(6)(i), (ii). Fishing under the LLP began on January 1, 2000.

Under the LLP, crab licenses are endorsed for specific areas and specific species. *See generally id.* § 679.4(k) (substantive requirements for groundfish and crab licenses). The Aleutian Islands brown king crab endorsement regulation at issue provides:

> A crab species license will be assigned [by NMFS] an Aleutian Islands brown king area/species endorsement *if at least three documented harvests of brown king crab were made by a vessel during the period*

*beginning January 1, 1992, through December 31, 1994* in the area described in the definition for an Aleutian Islands brown king area/species endorsement at [50 C.F.R.] § 679.2.

*Id.* § 679.4(k)(5)(ii)(D) (italics added; capitalization and ellipses omitted). "Documented harvest" is defined as "a lawful harvest that was recorded in compliance with Federal and state commercial fishing regulations in effect at the time of harvesting." *Id.* § 679.2. "Harvest" is not defined, but "[h]arvesting or to harvest means the catching and retaining of any fish." *Id.* The regulation defines the Aleutian Islands brown king crab endorsement area as:

Aleutian Islands brown king in waters with an eastern boundary the longitude of Scotch Cap Light (164° 44′ W. long.), a western boundary of the U.S.-Russian Convention Line of 1867, and a northern boundary of a line from the latitude of Cape Sarichef (54° 36′ N. lat.) westward to 171° W. long., then north to 55° 30′ N. lat., then west to the U.S.-Russian Convention Line of 1867.

*Id.*

Prior to the promulgation of the final LLP regulations, the term "legal landing" had been used in place of "documented harvest" as the criterion for endorsements. The proposed Aleutian Islands brown king crab endorsement regulation had required "at least three legal landings of any amount of brown king crab." Proposed Rule, 62 Fed. Reg. at 43,888. "Landing" is defined in the LLP regulations as "offloading fish." 50 C.F.R. § 679.2. "Legal landing" is further defined as "a landing in compliance with Federal and state commercial fishing regulations in effect at the time of landing." *Id.* The final LLP regulations, however, replaced "legal landing" with "documented harvest." NMFS explained the change, and the reason for it, as follows:

> A definition for the term "documented harvest" is added to the final rule. The term "documented harvest" replaces "legal landing" throughout the final rule. The new term more accurately describes the activity necessary for eligibility. Included in the proposed definition of legal landing was the activity of off-loading. Off-loading is not necessary for eligibility. Further, the area endorsement(s) a person is issued should reflect the area in which fishing occurred, not the area in which the fish were delivered.

Final Rule, 63 Fed. Reg. at 52,648 (describing the final rule).

NMFS administers the LLP through the Restricted Access Management Program ("RAM"), an agency within the Alaska Regional Office of NMFS. To determine which applicants qualify to receive an LLP endorsement, RAM must use the "official LLP record" prepared by NMFS. *See* 50 C.F.R. § 679.4(k)(6)(v). RAM "compare[s] all claims in the application with information in the official LLP record." *Id.* The "official LLP record" is defined as:

> the information prepared by the Regional Administrator [of NMSF] about vessels that were used to participate in the groundfish or crab fisheries during qualified periods for the groundfish and crab LLP specified at § 679.4(k) . . . . *Information in the official LLP record includes* vessel ownership information, *documented harvests made from vessels during the qualification periods*, and vessel characteristics. The official LLP record is presumed to be correct for the purpose of determining eligibility for licenses. An applicant for a license under the LLP will have the burden of proving the validity of information submitted in an application that is inconsistent with the official LLP record.

50 C.F.R. § 679.2 (emphasis added). If the applicant's claims are consistent with the information in the official LLP record, such claims will be accepted by RAM. 50 C.F.R. § 679.4(k)(6)(v). If, however, the applicant makes an inconsistent claim, the applicant has sixty days to "submit evidence to verify his or her inconsistent claims." *Id.* If RAM "determines that the additional information or evidence meets the applicant's burden of proving that the inconsistent claims in his or her application is correct, the official LLP record will be amended and the information will be used in determining whether the applicant is eligible for a license." *Id.* § 679.4(k)(6)(vi). If RAM determines that the additional evidence does not meet the applicant's burden, RAM notifies the applicant by an Initial Administrative Decision that the inconsistent claim cannot be approved. *Id.* § 679.4(k)(6)(viii). The applicant may then appeal this decision to NMFS' Office of Administrative Appeals pursuant to 50 C.F.R. § 679.43.

The State of Alaska, through regulations implemented by the Alaska Department of Fish and Game ("ADF&G"), requires commercial fishermen to report the catching and buying of crab. This information is originally recorded on ADF&G fish tickets. Relevant to this case, ADF&G requires that "[e]ach buyer of raw fish . . . shall record each landing on an ADF&G fish ticket." 5 Alaska Administrative Code ("AAC") § 39.130(c). The ADF&G regulations also require that the fish ticket separately list "the nearest headland or bay or statistical catch area in which the fish were taken." *Id.* § 39.130(c)(7). The Alaska Commercial Fisheries Entry Commission ("State Commission") collects information from ADF&G fish tickets to create data bases. The State Commission refers to its data bases as the gross earnings file ("GE file") and the condensed gross earnings file ("CGE file"). The administrative record for this case indicates that the GE file contains a separate line for each state statistical area where a crab catch was made.

The official LLP record for crab was derived solely from information obtained from ADF&G fish tickets because fish

tickets are the only available data source for catches of crab. RAM does not receive and review the actual fish tickets. Rather, the official LLP record relied on information obtained from the State Commission's data bases. Like the GE file, the official LLP record contains a separate line for each state statistical area where a catch of crab occurred; catches from different state statistical areas reported on one fish ticket have separate lines in the official LLP record.

The LLP was an interim program that has recently been replaced by a quota system, the Crab Rationalization Program. *See* 70 Fed. Reg. 10,174 (March 2, 2005) (codified at 15 C.F.R. pt. 902; 50 C.F.R. pts. 679 & 680) (describing Final Rule). Under the Crab Rationalization Program, qualified harvesters are allocated a quota share in a particular fishery if they hold a permanent, fully transferable LLP license endorsed for that fishery. *Id.* at 10,174-75; 50 C.F.R. § 680.40(b)(3)(i). Quota share holders receive an annual allocation to harvest a specific percentage of the fishery's total allowable catch. 70 Fed. Reg. at 10,175. Individual fishing quotas are the annual allocations of pounds of crab for harvest that represent a quota share holder's percentage of the total allowable catch.

### F/V Alaska Trojan

Alaska Trojan is the owner of the catcher vessel *F/V Alaska Trojan*. David Capri, formerly the captain of the *F/V Alaska Trojan*, is a partner in Alaska Trojan. In 1994, five years prior to RAM's internal interpretation, Alaska Trojan invested nearly $750,000 to reconfigure the *F/V Alaska Trojan* to participate in the Aleutian Islands brown king crab fishery. The *F/V Alaska Trojan* began fishing for brown and red king crab on November 1, 1994. Brown king crab were caught on November 5 and 7, 1994, in state statistical area 795200, an area known as Petrel Banks in the Aleutian Islands brown king crab endorsement area. Alaska Trojan had arranged in advance to deliver this crab to, and then receive a fish ticket

from, Mike Rosenthal, captain of the catcher/processor vessel *F/V Patricia Lee*. Capri radioed Rosenthal on November 7, but Rosenthal refused to take delivery because poor weather made it difficult to offload the crab and because he wanted to continue fishing for his own crab for processing rather than process crab from other boats. Because of these circumstances, even though the *F/V Alaska Trojan* had caught brown king crab from state statistical area 795200, Alaska Trojan was unable at that time to evidence this catch with a fish ticket. Instead, the *F/V Alaska Trojan* went to Kiska Island, picked up gear and fished for crab but without success. The *F/V Alaska Trojan* returned to Petrel Banks on November 12, 1994, and caught more brown king crab, this time from state statistical area 805201, also in the Aleutian Islands brown king crab endorsement area.

On November 24, 1994, the *F/V Alaska Trojan* delivered the brown king crab it caught in state statistical areas 795200 and 805201 to the *F/V Patricia Lee*. Upon delivery of this crab, Alaska Trojan was given one fish ticket. This fish ticket, as prepared by Capri and Rosenthal, shows that the crab were caught from state statistical areas 795200 and 805201.

Following the November 24 delivery, the *F/V Alaska Trojan* continued fishing. The crab caught were landed in Dutch Harbor on December 1, 1994. The fish ticket received for this landing reports that brown king crab were caught from one state statistical area in the Aleutian Islands brown king crab endorsement area. Following the 1994 season, Alaska Trojan has fished for brown king crab every year, and brown king crab have been the primary, and in some years the only, crab species harvested aboard the *F/V Alaska Trojan*.

**Proceedings Below**

Based on the information contained in the official LLP record, RAM sent Alaska Trojan a letter stating that Alaska Trojan had qualified for endorsements for five different crab

species, none of which were brown king crab. Alaska Trojan timely filed an application for an Aleutian Islands brown king crab endorsement on December 6, 1999. RAM denied Alaska Trojan's application for this endorsement in an Initial Administrative Decision.

Alaska Trojan then appealed to the Office of Administrative Appeals, arguing that it had three documented harvests during the endorsement qualification period. Although Alaska Trojan had only two fish tickets from 1994, those tickets demonstrated that brown king crab were caught from three state statistical areas on three separate occasions within the Aleutian Islands brown king crab endorsement area, and these catches were recorded in compliance with ADF&G regulations. RAM responded with a copy of an Alaska Trojan fish ticket received from ADF&G that had state statistical area 805201 crossed out, showing only a catch from area 795200. Because ADF&G's version of this fish ticket listed only one state statistical area, the official LLP record also lists a catch from only one state statistical area from this fish ticket. Alaska Trojan did not know how or why 805201 was crossed out.

Alaska Trojan argued that the official LLP record should be amended to reflect the catch from state statistical area 805201. It contended that once the official LLP record was amended to include this third line representing a catch of brown king crab from a distinct state statistical area, this third line entry would evidence Alaska Trojan's third documented harvest. With a third documented harvest, Alaska Trojan would qualify to receive an Aleutian Islands brown king crab endorsement.

During the administrative appeal, RAM's understanding of what constituted a documented harvest of brown king crab was revealed. RAM did not consider each line entry in the official LLP record representing a catch from a state statistical area to be a documented harvest. Rather, RAM personnel tes-

tified that an "internal policy" was devised, as reflected in a June 7, 1999, e-mail that stated: "For fish tickets, each valid fish ticket of delivered catch will be counted as evidence of one documented harvest." This e-mail directive was translated into an internal computer programming "business rule" that RAM used to screen the official LLP record. In other words, RAM adopted a "one fish ticket equals one documented harvest" rule: one "documented harvest" was all the crab of one LLP species caught and retained from one LLP crab endorsement area that was landed and recorded on one fish ticket, irrespective of where and on how many occasions the crab were caught. In an exception to RAM's "one fish ticket equals one documented harvest" rule not applicable here, RAM allows for one fish ticket to equal two documented harvests if the fish ticket showed that *two different* LLP species were caught. This exception suggests that interpretations by RAM can be made on the basis of separate catches that are represented on the fish ticket.

Neither the "internal policy" nor the "business rule" were promulgated as regulations with notice and comment procedures. As this interpretation was not in the LLP regulations nor otherwise made available, Alaska Trojan's administrative appeal was the first time this interpretation surfaced publicly.

The Office of Administrative Appeals held a hearing on RAM's construction of the official LLP record. At the hearing, RAM personnel testified that RAM did not consult with the Council in formulating their interpretation. Rather, RAM believed there was no ambiguity in the definition of "documented harvest" and its interpretation was based on "a straightforward reading of the regulations." In addition, RAM's Program Administrator acknowledged that a line entry in the official LLP record does, in fact, document a harvest:

> Mr. Smith [RAM Program Administrator]: . . . [I]f, in relation to [the November 24] delivery, the fish

> ticket file had documented harvest of Brown King
> Crab in two statistical areas, would the official LLP
> record also have documented a harvest? Well, yes,
> but it would not have been a documented harvest.
>
> . . .
>
> Q.   [by Alaska Trojan's Counsel]: Let me under-
> stand. Your answer is it documents a harvest, but it's
> not a quote/unquote documented harvest?
>
> A.   For the purposes of the definition contained in
> 679.2, that's correct.

Further, applying RAM's interpretation, RAM's Program
Administrator acknowledged that if the *F/V Alaska Trojan*
had not experienced poor weather and the *F/V Patricia Lee*
had decided to accept Alaska Trojan's crab in early Novem-
ber, and therefore had issued the *F/V Alaska Trojan* another
fish ticket, "we wouldn't be here" because Alaska Trojan
would have had three fish tickets during the endorsement
qualification period, representing three documented harvests.

The Office of Administrative Appeals issued a decision
denying Alaska Trojan's appeal. It upheld RAM's interpreta-
tion of "documented harvest" and RAM's finding that Alaska
Trojan had only two documented harvests during the endorse-
ment qualification period, as represented by the November 24,
1994, and December 1, 1994, fish tickets. The Office of
Administrative Appeals subsequently denied Alaska Trojan's
motion for reconsideration. Based on this decision, RAM sent
Alaska Trojan a letter of Final Agency Action invalidating
Alaska Trojan's interim LLP license effective December 31,
2003, pursuant to which Alaska Trojan had been fishing dur-
ing the pendency of its administrative appeals. RAM also
issued Alaska Trojan a transferable LLP license without the
Aleutian Islands brown king crab endorsement.

Alaska Trojan then filed a complaint in the United States District Court for the District of Alaska challenging the denial of its claim for an Aleutian Islands brown king crab endorsement. Alaska Trojan alleged that defendants violated the Magnuson Act and the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*. Alaska Trojan moved for summary judgment, defendants cross-moved for summary judgment, and on July 27, 2004, the district court issued an order denying Alaska Trojan's motion for summary judgment and granting defendants' cross-motion. The district court entered a final judgment the next day, and Alaska Trojan timely appealed on August 25, 2004. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

**Standard of Review**

This court reviews *de novo* the district court's grant of summary judgment upholding an agency decision. *Wards Cove Packing Co. v. NMFS*, 307 F.3d 1214, 1218 (9th Cir. 2002). With certain exceptions not applicable here, defendants' decision under the Magnuson Act is governed by the Administrative Procedure Act. *See* 16 U.S.C. § 1855(f). This court is to set aside defendants' action only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2)(A); *see also Wards Cove*, 307 F.3d at 1218. Substantial deference is given "to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted). This court "must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " *Id.* (citation omitted); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation.") (citations and internal quotation marks omitted);

*Wards Cove*, 307 F.3d at 1218 ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation.") (citations omitted).

### Interpreting "Documented Harvest" as a "Landing" Is Plainly Erroneous

Alaska Trojan argues that RAM improperly interpreted "documented harvest" to exclude one of its two November 1994 catches. " 'In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' " *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)) (alteration in original). When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage. *Compare F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). An agency's interpretation of a regulation must "conform with the wording and purpose of the regulation." *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th Cir. 2003). Thus, we must look not only at the definition of documented harvest in isolation, but also at that definition in the context of the entire LLP regulations, to determine whether RAM's interpretation is permissible.

[1] The LLP regulations do not leave "documented harvest" undefined and thereby allow RAM to provide the interpretation it provided in this case. The LLP regulations expressly define "documented harvest" as "a lawful harvest that was recorded in compliance with Federal and state commercial fishing regulations in effect at the time of harvesting." 50 C.F.R. § 679.2. The LLP regulations also expressly define another term, "legal landing," as "a landing in compliance with Federal and state commercial fishing regulations in

effect at the time of landing." *Id.* "Landing" is defined as "offloading fish." *Id.*

Even though at the time it derived its internal interpretation RAM believed the term "documented harvest" unambiguously meant "landing," defendants now attempt to create ambiguity in the definition of documented harvest by arguing that "harvest"—a term used within the definition—is not defined in the LLP regulations. Therefore, defendants argue, RAM has the discretion to craft a reasonable interpretation as to what constitutes a "harvest" for purposes of a "documented harvest." RAM interprets "harvest" to mean a "landing" of crab, and this harvest is documented by an ADF&G fish ticket received upon the offloading of the crab. RAM's interpretation requires an offload of crab in order to be considered a harvest of crab.

**[2]** Defendants are correct that "harvest" is not defined in the LLP regulations. However, this court must look at the regulations as a whole in determining the plain meaning of a term. *See McCarthy*, 500 U.S. at 139. It is clear from the LLP regulations that a harvest *cannot* be defined as an offload, as the LLP regulations separately define *landing* as an offload. *See* 50 C.F.R. § 679.2. Moreover, while not defining "harvest," the regulations do define "[h]arvesting or to harvest" as "the catching and retaining of any fish." *Id.* "Harvesting or to harvest" is not defined as "offloading" or "receiving a fish ticket." Notably, "landing," the one term defined in the LLP regulations that is the nearest equivalent to receiving a fish ticket, does not appear in this definition.

**[3]** Applying the plain meaning of "harvesting or to harvest" in relation to brown king crab, the definition of "documented harvest" would be "a lawful catching and retaining of brown king crab that was recorded in compliance with Federal and state commercial fishing regulations in effect at the time of harvesting." The event that triggers a harvest under the plain meaning of LLP regulations is not an offload of

crab, but rather the lawful catching and retaining of crab, and the recording of this catch in compliance with ADF&G regulations. On an ADF&G fish ticket, ADF&G regulations require that the fish ticket separately list "the nearest headland or bay or statistical catch area in which the fish were taken." 5 AAC § 39.130(c)(7).

Under RAM's interpretation, a documented harvest of brown king crab is an offload of crab through a landing as evidenced by a fish ticket. RAM's interpretation—that one documented harvest is one fish ticket—effectively defines one documented harvest as one legal landing. However, the LLP regulations have a separate definition for "legal landing" as "a landing in compliance with Federal and state commercial fishing regulations in effect at the time of landing," and "landing" is defined as "offloading fish." 50 C.F.R. § 679.2. Instead of a "harvest" being "a lawful *catching and retaining* of brown king crab," RAM has re-written the definition of "documented harvest" to mean "a lawful *offload* of brown king crab that was recorded in compliance with Federal and state commercial fishing regulations in effect at the time of harvesting."

**[4]** Had the Secretary preferred RAM's interpretation that a documented harvest is a legal landing, and thus an offload is a requirement for eligibility, the term "legal landing" would have been used instead of "documented harvest." This court need not speculate as to whether the Secretary actually intended to mean legal landing instead of documented harvest because, in promulgating the final LLP regulations, the Secretary approved NMFS' statement *expressly stating* that documented harvest was the preferred term over legal landing. The *proposed* Aleutian Islands brown king crab endorsement regulation required "at least three legal landings of any amount of brown king crab." *See* Proposed Rule, 62 Fed. Reg. at 43,888. When the final LLP regulations were promulgated, however, "legal landing" was replaced with "documented harvest." This change was explained in the regulations as follows:

> A definition for the term "documented harvest" is added to the final rule. The term "documented harvest" replaces "legal landing" throughout the final rule. *The new term more accurately describes the activity necessary for eligibility.* Included in the proposed definition of legal landing was the activity of off-loading. *Off-loading is not necessary for eligibility.* Further, *the area endorsement(s) a person is issued should reflect the area in which fishing occurred, not the area in which the fish was delivered.*

Final Rule, 63 Fed. Reg. at 52,648 (emphasis added). In other words, while offloading (a landing) is necessary to obtain a fish ticket and a fish ticket must be obtained under ADF&G regulations, offloading (a landing) is not necessary for a catch to be considered a "documented harvest." Therefore, evidence of one offload through one fish ticket is not necessarily evidence of only one documented harvest. RAM's interpretation, however, mandates offloading as a necessary requirement for a catch to be considered a documented harvest. While RAM's interpretation seems consistent with the definition of legal landing, it is clearly inconsistent with the definition of documented harvest.

RAM's reliance on the number of fish tickets to determine the number of documented harvests misconstrues what a fish ticket represents under the plain meaning of the LLP regulatory definitions. The regulations define a landing—but not a documented harvest or a harvest—as "offloading fish." 50 C.F.R. § 679.2. Fish tickets are the sole data source for catches of crab. One fish ticket has a correlation to one landing because a fish ticket is received upon the landing of crab. One fish ticket, however, does not necessarily reflect that only one harvest of crab took place. Instead, fish tickets are instrumentalities by which one or more harvests of Aleutian Islands brown king crab are documented. The content of the fish ticket will show how many harvests have occurred. It is the

substance of the fish ticket that is material in the analysis, not merely the form of one fish ticket.

The regulatory definition and construction of the official LLP record, upon which an applicant's claims are determined, *see id.* § 679.4(k)(6)(v), further demonstrate how RAM's interpretation is inconsistent with the definition of documented harvest. The information in the official LLP record includes "documented harvests made from vessels during the qualification periods." *Id.* § 679.2. The definition of the official LLP record does not refer to "landings," "offloads," or "fish tickets." Information on documented harvests is obtained from the State Commission's data bases which list each catch of crab not by fish ticket but by state statistical area. Again, it is the substance of the fish ticket, and not the total number of fish tickets, that is the basis for recording catches. Similar to the State Commission's data bases, catches in the official LLP record are also *not* listed by fish ticket number. Instead, catches are listed by the state statistical area from where the crab were caught.

Defendants argue that the state statistical areas are placed in the official LLP record only so that RAM can determine if the crab were caught in the larger federal endorsement area. Defendants correctly point out that RAM adds the federal endorsement area to the official LLP record, an item of information that is not included on the fish ticket. What is noteworthy about the official LLP record, however, is not what RAM added, but rather what is not done to the official LLP record. The official LLP record tracked the State Commission's data bases by documenting each catch by state statistical area, not by fish ticket number. Identification of the state statistical area was not removed from the official LLP record and, similar to the State Commission's data bases, the state statistical area remained a separate line representing a distinct catch of crab. Moreover, the separate state statistical area entries were not combined into a single entry where they were associated with a single fish ticket. When the official LLP

record was prepared, crab catches in different state statistical areas retained their separate identities, even though such catches were delivered on the same date and reported on one fish ticket. Thus, the construction of the official LLP record lends no support to RAM and in fact contradicts RAM's interpretation that one fish ticket represents one documented harvest. It is the substance of the fish ticket that represents each line in the official LLP record, and RAM ignored this inescapable conclusion in its faulty interpretation.

In an attempt to support RAM's interpretation, defendants argue that in replacing "legal landing" with "documented harvest," the Secretary actually intended to maintain "legal landing" as the requirement for crab catcher vessels such as the *F/V Alaska Trojan*. Defendants argue that this change in terminology was done only to reflect the practice of catcher/ processor vessels who process their own catch on board and can write themselves fish tickets without offloading their catch. In addition to the fact that this rationale is found nowhere in the LLP regulations, it is also inconsistent with the structure of the LLP regulations. The LLP regulations acknowledge that there are differences between catcher vessels and catcher/processor vessels by, for example, separately defining each term, *see* 50 C.F.R. § 679.2, and having separate requirements for each vessel. *See generally id.* § 679.4. In the proposed LLP regulations, crab catcher vessels—and every other vessel—had to establish "at least three legal landings of any amount of brown king crab." Proposed Rule, 62 Fed. Reg. at 43,888. Had the Secretary actually intended "legal landing" to remain the requirement for crab catcher vessels, this requirement would have been left alone. Instead, the Secretary approved the replacement of "legal landing" with "documented harvest" "throughout the final rule," including as it relates to requirements for crab catcher vessels. Final Rule, 63 Fed. Reg. at 52,648.

**[5]** Notably, under the new Crab Rationalization Program, the Secretary has decided to measure quota share for crab

catcher vessels according to *legal landings*, as opposed to documented harvests. *See, e.g.*, 50 C.F.R. § 680.40(b)(1)(i) ("Catcher Vessel Owner . . . [quota share] shall be initially issued to qualified persons . . . based on legal landings of unprocessed crab."). The Secretary could have required the same under the final LLP regulations, but chose a different measurement. Under the plain meaning of the final LLP regulations, crab catcher vessels—along with every other vessel— must have established three documented harvests of Aleutian Islands brown king crab during the endorsement qualification period, not three legal landings.[2]

### Interpreting "Documented Harvest" as a "Landing" Is Inconsistent with the Intent of the LLP as Expressed by the Secretary

[6] Notwithstanding the fact that RAM's interpretation is at odds with the plain meaning of the regulatory definition of "documented harvest," RAM's interpretation suffers a second flaw: it is inconsistent with the intent of the LLP regulations as expressed by the Secretary at the time of final promulgation. *See Thomas Jefferson Univ.*, 512 U.S. at 512; *see also Auer*, 519 U.S. at 461.

As one landing is evidenced by one fish ticket, RAM admits that its interpretation requires one landing of crab in order to receive credit for one documented harvest. However,

---

[2]The Secretary, in providing a definition as to what constitutes evidence of a "documented harvest" of groundfish under the LLP, made a distinction between a "harvest" and a "landing." Regarding groundfish, the LLP regulation states: "For purposes of the license limitation program, evidence of a documented harvest must be demonstrated by a state catch report, a Federal catch report, or other valid documentation that indicates the amount of license limitation groundfish harvested, the groundfish reporting area in which the license limitation groundfish was harvested, the vessel and gear type used to harvest the license limitation groundfish, *and the date of harvesting, landing, or reporting.*" *Id.* § 679.4(k)(4) (emphasis added).

this interpretation equating one landing for one documented harvest cannot be squared with the Secretary's express intent at the time the final LLP regulations were promulgated. As discussed above, the proposed Aleutian Islands brown king crab endorsement regulation required "at least three *legal landings* of any amount of brown king crab." *See* Proposed Rule, 62 Fed. Reg. at 43,888 (emphasis added). When the final LLP regulations were promulgated, the Secretary approved NMFS' replacement of "legal landing" with "documented harvest," which stated that the term "documented harvest" "more accurately describes the activity necessary for eligibility." Final Rule, 63 Fed. Reg. at 52,648. NMFS noted that a legal landing required an offload, and with the change to the term documented harvest, "[o]ff-loading is not necessary for eligibility." *Id.* NMFS also stated that "the area endorsement(s) a person is issued should reflect the area in which fishing occurred, not the area in which the fish were delivered." *Id.*

**[7]** This was an important change because, as discussed above, the terms "documented harvest" and "legal landing" are not synonymous. These two terms have distinct and different definitions in the LLP regulations. *See* 50 C.F.R. § 679.2. The Secretary approved NMFS' express statement at the time of the final LLP regulations' promulgation that this change in terminology was to reflect that "[o]ff-loading is not necessary for eligibility." Final Rule, 63 Fed. Reg. at 52,648. This was a clear, expressed intent that one offload does not necessarily equate to one documented harvest because offloading is not necessary for a catch to be considered a documented harvest. By this statement, the Secretary made clear that the substance of the fish ticket, and not simply a fish ticket by itself, is crucial in determining what constitutes a "documented harvest."

**[8]** RAM's interpretation contravenes this intent by requiring an offload of a catch for that catch to be considered a documented harvest. Under RAM's interpretation, evidence of an offload—a fish ticket—is now the determining factor as to

whether a catch is a documented harvest. Further, where the fish are delivered—through evidence of a fish ticket—is now paramount in contrast to where the crab were harvested, which *could* be evidenced by the state statistical area where the crab were caught. Because the Secretary evidenced the intent that evidence of an offload is no longer necessary for eligibility, RAM's interpretation is inconsistent with that intent. *See Thomas Jefferson Univ.*, 512 U.S. at 512.

Defendants argue that the change from "legal landing" to "documented harvest" was not really a substantive change. This argument is belied by the clear meaning of the preceding sentence describing this change as a "substantive change[ ] to the final rule." Final Rule, 63 Fed. Reg. at 52,648. As one offload—in other words, one landing—was no longer required for a catch to be considered one documented harvest, this must be considered a substantive change in the regulations.

In support of its argument that equating "documented harvest" with "landing" is consistent with the Secretary's intent, defendants point to the Council's use of the term "landing" when projecting the number of permits that would be issued under different alternatives. Notwithstanding the fact that RAM did not seek the Council's input when formulating its internal interpretation, it is not entirely clear that the Council was referring to the number of fish tickets when it used the term "landing" in relation to crab. The Council defines a landing of *groundfish* as "a legal landing of any amount of any groundfish species under the management auspice of the NPFMC [the Council] and NMFS, with the exception of sablefish which is managed under a separate IFQ program." However, the administrative record contains no documents in which the Council defined what it considered to be a landing of crab. Defendants' argument is plausible because a landing of either crab or groundfish is defined in the LLP as "offloading fish," *see* 50 C.F.R. § 679.2, and the only way to document an offload of crab is through a fish ticket. Further,

ADF&G regulations also state that "each landing" must be recorded "on an ADF&G fish ticket." 5 AAC § 39.130(c).

However, as Alaska Trojan points out, the Council's source of landing information came from the State Commission's data bases, specifically the CGE file. Both the State Commission's CGE file and its similar GE file contain information derived from ADF&G fish tickets. The administrative record shows that Alaska Trojan presented evidence that, similar to the official LLP record, the GE file contains a separate line for each state statistical area representing where crab were caught and not for each fish ticket representing where crab were offloaded. Also similar to the official LLP record, the GE file does not group all state statistical areas into one line representing the fish ticket number. Alaska Trojan argues that there is no evidence in the record nor any reason to assume that the data presented in the CGE file was any different than the data presented in the GE file. Therefore, Alaska Trojan suggests that by landings, the Council was referring to each line in the GE file, which would correspond to state statistical areas, not fish tickets.

Even assuming that by "landing" the Council was referring to one fish ticket, defendants disregard the fact that the Secretary's intent changed at the time the final LLP regulations were promulgated. While the Council may have considered fish tickets, it later clarified and expressly stated that offloading is no longer necessary for eligibility. RAM's interpretation may have been consistent with the proposed LLP regulations requiring three legal landings, but it is inconsistent with the final LLP regulations requiring three documented harvests.

**Alaska Trojan Is Entitled to an Aleutian Islands Brown King Crab Endorsement**

[9] Generally, when an agency commits an error of law, this court remands to the agency to reconsider its decision as

required by law. *See NLRB v. Enter. Ass'n*, 429 U.S. 507, 522 n.9 (1977) ("When an administrative agency has made an error of law, the duty of the Court is to 'correct the error of law committed by that body, and, after doing so to remand the case to the (agency) so as to afford it the opportunity of examining the evidence and finding the facts as required by law.' ") (quoting *ICC v. Clyde S.S. Co.*, 181 U.S. 29, 32-33 (1901)). Here, defendants have committed an error of law through RAM's impermissible interpretation of "documented harvest" as a "landing." In the interests of judicial economy, however, this court need not remand to defendants for a new interpretation. Instead, we hold that, under the facts of this case, there is no reasonable interpretation that defendants could adopt that would deny Alaska Trojan an Aleutian Islands brown king crab endorsement. The circumstances surrounding the two catches reported on the November 24, 1994, fish ticket demonstrate that these two catches were "harvests" within the meaning of the LLP regulations and, having been recorded in compliance with state regulations, must be deemed "documented harvests." *See* 50 C.F.R. § 679.2.

It is important to point out that, under the new Crab Rationalization Program, Alaska Trojan's receipt of an Aleutian Islands brown king crab endorsement will not cause any disruption in the ecology of the designated Aleutian Islands brown king crab endorsement area. Under the new program, if Alaska Trojan did not receive an Aleutian Islands brown king crab endorsement, then other vessels would have received the quota share and annual individual fishing quota that would have gone to Alaska Trojan. However, once Alaska Trojan receives its Aleutian Islands brown king crab endorsement, Alaska Trojan may receive a quota share and annual individual fishing quota based on its own harvesting history. Because the Crab Rationalization Program mandates a total allowable catch for the fishery, the amount of brown king crab that could be harvested will remain the same.

## CONCLUSION

**[10]** We **REVERSE** the part of the district court's order granting summary judgment to defendants, **VACATE** the part denying summary judgment to Alaska Trojan, and **REMAND** to the district court with instructions to enter summary judgment in favor of Alaska Trojan.

The preliminary injunction ordered by this court on August 8, 2005, directing defendants to allow Alaska Trojan to participate on an interim basis in the Western Aleutian Islands golden king crab fishery that opened on August 15, 2005, as if Alaska Trojan had originally qualified for an Aleutian Islands brown king crab endorsement on its license, No. LLC3873, shall remain in effect pending Alaska Trojan's receipt of an Aleutian Islands brown king crab endorsement on its permanent, transferable LLP license.